JUDGE MARRERO 12 CIV 9396

James J. McGuire
Vincent Filardo, Jr.
MISHCON DE REYA NEW YORK LLP
750 7th Avenue, 26th Fl.
New York, NY 10019
(212) 612-3270 (phone)
(212) 612-3297 (fax)

RECEIVED
DEC 27 2012
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**BRYANSTON GROUP, INC,**

**Plaintiff,**

**-against-**

**KIEN HUAT REALTY III, LTD., individually and as Shareholder of EMPIRE RESORTS, INC.,**

**COLIN AU, individually and as Director of EMPIRE RESORTS, INC.,**

**JOSEPH D'AMATO, individually and as Director of EMPIRE RESORTS, INC., and**

**EMANUEL PEARLMAN, individually and as Director of EMPIRE RESORTS, INC.,**

**Defendants.**

---

**Civil Action No. __________**

**ECF Case**

**COMPLAINT AND JURY DEMAND**

Plaintiff Bryanston Group, Inc. ("Bryanston"), by its attorneys, Mishcon de Reya New York LLP, as and for its Complaint against Defendants Kien Huat Realty III, Ltd ("Kien Huat"), Colin Au , Joseph D'Amato, and Emanuel Pearlman, alleges as follows:

## INTRODUCTION

1. This is a civil action arising under the laws of the United States of America and States of Delaware and New York, alleging claims for breach of fiduciary duty, lender liability, tortious interference with contract, aiding and abetting breach of fiduciary duty, and Declaratory Judgment.

2. The claims propounded herein stem from a scheme that Defendant Kien Huat, the majority shareholder, largest creditor, and primary source capital of New York-based Empire Resorts, Inc. ("Empire"), masterminded and effectuated through its domination of and control over Empire's Board of Directors, including Kien Huat-appointed Director Defendants Au, D'Amato, and Pearlman. The scheme's purpose was to gradually acquire a significant majority ownership of Empire in order to wrest control of its coveted racing and gaming licenses and other corporate opportunities for the sole benefit of Kien Huat, its affiliates, and related entities and individuals.

3. Plaintiff seeks monetary and declaratory relief and all other appropriate remedies to which it is entitled under United States, Delaware, and New York law.

## PARTIES

4. At all relevant times, Bryanston was and is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in the State of Florida and offices located at P.O. Box 2424, Winter Park, Florida 32790.

5. At all relevant times, Plaintiff has been the record and beneficial owner of Empire Series E Preferred Stock. Since December 10, 2002 and on all dates since then, Plaintiff has beneficially owned some 1,551,213 shares of Empire Series E Preferred Stock. As such, Bryanston is the majority holder of this series of Empire stock.

6. Empire was and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Monticello, New York and offices located at Monticello Casino and Raceway, Route 17B, P.O. Box 5013, Monticello, New York 12701. It is also a publicly traded company listed on the NASDAQ Exchange trading under the symbol NYNY. Empire is a holding company for various subsidiaries engaged in the hospitality and gaming industries. Empire further owns and operates the Monticello Casino and Raceway, which has video gaming and harness horse racing facilities located in Monticello, New York.

7. Upon information and belief, at all relevant times, Defendant Kien Huat was and is a foreign company organized in the Isle of Man and existing in Kuala Lumpur, Malaysia. Since on or about October 1, 2009, Kien Huat has been the majority common stockholder of Empire. Upon information and belief, Kien Huat is an active participant in the affairs of Empire, exerts control over its affairs in the State of New York, and derives substantial revenue from its activities in said State as well as from international commerce.

8. Upon information and belief, Defendant Colin Au was and is a citizen and resident of Sydney, Australia. Since on or about August 19, 2009 when Kien Huat appointed him, Mr. Au has served as a Director of Empire. Upon information and belief, Mr. Au is an active participant in the affairs of Empire and exerts control over its affairs

in New York. Mr. Au is also a former Director of certain Kien Huat affiliates, having served for over thirty (30) years in that capacity, and a current Director of Genting Hong Kong Limited (f.k.a. Star Cruises, Ltd.). Mr. Au is also purportedly a principal in and President of Genting Group. Upon information and belief, both Genting Hong Kong and Genting Group are close affiliates of Kien Huat. Upon information and belief, Mr. Au derives substantial revenue from services rendered in the State of New York as well as from international commerce.

9. Upon information and belief, Defendant Joseph D'Amato was and is a citizen and resident of the State of New Jersey. Since on or about September 9, 2010, Mr. D'Amato, whom Kien Huat also appointed, has served as a Director of Empire. Since on or about December 24, 2009, Mr. D'Amato has also served as Chief Executive Officer of Empire. For about a year of this period, Mr. D'Amato also served as Empire's Chief Financial Officer. Upon information and belief, Mr. D'Amato is an active participant in the affairs of Empire and exerts control over its affairs in New York. Upon information and belief, Mr. D'Amato derives substantial revenue from services rendered in the State of New York as well as from international commerce.

10. Upon information and belief, Defendant Emanuel Pearlman was and is a citizen and resident of New Jersey. Since on or about May 27, 2010, Mr. Pearlman, whom Kien Huat also appointed, has served as a Director of Empire. Upon information and belief, Mr. Perlman is an active participant in the affairs of Empire and exerts control over its affairs in New York. Upon information and belief, Mr. Perlman derives substantial revenue from services rendered in the State of New York as well as from international commerce.

11. Upon information and belief, Kien Huat owns approximately sixty-one and two-tenths percent (61.2%) of Empire and, as alleged herein, dominates and controls Empire and its Board of Directors.

## JURISDICTION AND VENUE

12. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because this is a civil action between citizens of different U.S. states, a foreign citizen and citizens of U.S. states, and/or citizens of different U.S. states with additional foreign parties. Diversity jurisdiction is also proper, because the amount in controversy exceeds $75,000. This Court has authority to order declaratory relief under 28 U.S.C. §§ 2201-02, because there is an actual, justiciable controversy between Plaintiff and Defendants.

13. Personal jurisdiction is proper over all Defendants pursuant to N.Y. C.P.L.R. §§ 301, 302(a)(1), 302(a)(2), 302(a)(3)(i), and 302(a)(3)(ii), because, upon information and belief, Defendants are New York State residents, committed tortious acts within the State of New York, or committed tortious acts outside the State of New York causing injury to a person or property within the state and regularly do business in the State of New York, derive substantial revenue from services rendered in the State of New York, expect or should reasonably expect their acts to have consequences in the State of New York, and derive substantial revenue from interstate or international commerce.

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to the claims herein occurred in Sullivan and New York Counties, New York, and Defendants either reside in this District, may be found in this District, have agents in this District, or transact their affairs in this District.

## FACTUAL ALLEGATIONS

### A. Plaintiff Purchases Series E Preferred Stock In Empire.

15. On or about December 10, 2002, Plaintiff, along with certain non-parties, entered into a Recapitalization Agreement with Empire, then known as Alpha Hospitality Corporation ("Recapitalization Agreement"). Upon information and belief, the Recapitalization Agreement was drafted and entered into in New York. Annexed as Exhibit A is a true and correct copy of said Agreement.

16. In exchange for valuable consideration and pursuant to the Recapitalization Agreement, Bryanston received a total of 1,551,213 shares of Empire Series E Preferred Stock. See Exh. A at § 1.3, Schedule 1.5.

17. Pursuant to Section 1.8 of the Recapitalization Agreement, Empire was granted the right to redeem the subject Series E Preferred Stock at $10.00 per share. The Series E Preferred Stock accrues dividends at a rate of 8% of the liquidation value running from December 10, 2002 through date of redemption. Exh. A at § 1.8, Exhibit A.

18. Pursuant to the Recapitalization Agreement, the Series E Preferred Stock did not initially carry voting rights. However, on or about January 12, 2004, Empire granted voting rights to all Series E Preferred stockholders, including to Plaintiff, following Empire's Board of Directors' adoption of a "Certificate of Amendment of Certificate of Designations, Powers, Preferences and Other Rights and Qualifications of the Series E Preferred Stock." Since then, Plaintiff has never received any notice to vote on any extraordinary corporate acts.

19. Pursuant to Section 1.9 of the Recapitalization Agreement, as long as Series E Preferred Stock remains outstanding, Empire is not permitted to pay any dividends or

distributions from the "Net Available Cash Flow" for any purpose other than for purchase of Common Option Shares (which have been redeemed) or the Series E Preferred Shares. In addition, Empire agreed to robust restrictions on the use of its cash flow to ensure that Series E shareholders would be paid as required; to wit, as follows:

> [Empire] agrees that so long as any of the Preferred Shares remain outstanding, no dividends shall be paid and no distributions shall be made from the Net Available Cash Flow of [Empire] for any purpose other than purchase of the Common Option Shares or the retirement of the Preferred Shares. For purposes of this Agreement "Net Available Cash Flow" shall mean the net amounts received by [Empire] in connection with any sale of [Empire's] business assets after the date hereof, or the issuance of any stock or debt by [Empire], or the net amount resulting from any business operation(s) conducted by [Empire], but shall not include (i) any amount used to retire the outstanding promissory note issued by [Empire] to Societe Generale or (ii) such additional amount, not to exceed $1,000,000 in any calendar year, that [Empire] shall apply or set aside to apply for payment of reasonable operating expenses of [Empire].

Exh. A at § 1.9. Upon information and belief, on or about June 20, 2003, Empire retired the Societe Generale loan.

20. Upon information and belief, since 2002, Empire has on various occasions either received proceeds from the (a) sale of Empire assets and/or (b) issuance of stock or debt and has distributed more than $1,000,000 in reasonable operating expenses <u>per</u> calendar year above such proceeds without redeeming any of the Series E Preferred Stock or making any payment of accrued dividends on such stock.

21. Upon information and belief, Empire has never calculated its "Net Available Cash Flow" for any given year despite a clear and unambiguous obligation to do so.

22. Kien Huat had actual knowledge of the Recapitalization Agreement.

**B. <u>Kien Huat Gains Control Over Empire And Its Board Of Directors And Usurps Empire's Corporate Opportunity.</u>**

23. On or about July 13, 2009, Lim Kok Thay ("Mr. Lim"), a beneficial owner of Kien Huat and its principal decision-maker, met with several Empire Directors to negotiate an agreement on investment between Kien Huat and Empire. Upon information and belief, this meeting took place in New York.

24. Upon information and belief, on or about August 19, 2009, Kien Huat entered into an Investment Agreement with Empire to purchase approximately 35,000,000 common shares in Empire in exchange for a $10,000,000 credit facility and approximately $55,000,000 in cash, which was to be paid in two tranches and concluded in November 2009 ("Investment Agreement"). Upon information and belief, the Investment Agreement was entered into in New York. As of on or about December 27, 2010, Kien Huat owned 34,936,357 shares of Empire common stock, representing approximately 50.3% of Empire's outstanding common stock, making it Empire's single largest shareholder.

25. As the majority shareholder in Empire, Kien Huat acquired the right to appoint three (3) of Empire's six (6) directors, which it has exercised. <u>See</u> Empire Resorts S-1, filed on December 29, 2010 ("S-1 Filing") at 25, a true and correct copy of which is annexed as Exhibit B.

26. At the same time, Kien Huat and Empire entered into the Investment Agreement, pursuant to which Kien Huat appointed Messrs. Au and Michael G. Brown to Empire's Board of Directors. Together with Mr. Pearlman, who Kien Huat had previously appointed to Empire's Board, Kien Huat has control of at least three of the six Directors on the Board. Mr. Brown resigned in September 2010 owing to alleged health

reasons; Kien Huat then elevated Mr. Pearlman to Chairman of the Board. In or about December 2010, Kien Huat appointed Mr. D'Amato, whom Kien Huat had previously made President and CEO of Empire. To date, all three of these individuals continue to serve on Empire's Board of Directors.

27. Upon information and belief, Empire's Board regularly meets and transacts business in the State of New York, including approving and directing the unlawful acts in violation and breach of the Recapitalization Agreement, as described herein.

28. Kien Huat is far more than a passive investor in Empire. Indeed, in addition to being Empire's largest shareholder, Kien Huat is Empire's largest creditor, primary source of capital, and an applicant and affiant on Empire's New York State racing and gaming licenses. As a result, Kien Huat holds overwhelming control over and domination of Empire's Board of Directors.

29. As provided in the Investment Agreement, on or about August 19, 2009, Empire entered into a Consulting Agreement with Mr. Au. Upon information and belief, the Consulting Agreement was entered into in New York. Under this Agreement, Mr. Au agreed to assist Empire in expanding its New York presence in the gaming industry and advise Empire on matters relating to casino development. In exchange for these services, Empire agreed to pay Mr. Au $300,000 USD annually in equal monthly installments, separate and apart from the compensation he was to receive as a Director of Empire.

30. Upon information and belief, during the July 19 meeting, Empire's former CEO, Joseph Bernstein, and two Empire directors, Ralph Bernstein and Louis Cappelli, proposed to Mr. Lim that Empire should bid on Aqueduct Racetrack's complex rehab

center ("Aqueduct Project"), together with Kien Huat and certain additional partners, in a joint venture.

31. In or about early May 2010, before the request for proposal came out, Mr. Capelli discussed with Mr. Au the possibility of Empire and Kien Huat together bidding on the Aqueduct Project. Upon information and belief, these discussions took place in New York. During these discussions, Mr. Capelli provided Mr. Au with certain confidential materials generated by Empire, including a corporate strategy, projections, and a proposed minimum bid of $350,000,000 ("Confidential Aqueduct Materials").

32. Upon information and belief, Mr. Au shared the Confidential Aqueduct Materials with Empire Director Mr. Brown. Upon information and belief, neither Mr. Au nor Mr. Brown ever shared the Confidential Aqueduct Materials with Empire's remaining Directors.

33. Instead, upon information and belief, Messrs. Brown and Au disclosed the Confidential Aqueduct Materials to Mr. Lim, Kien Huat, and Genting New York LLC, a Kien Huat affiliate.

34. Subsequently, upon information and belief, at Kien Huat's behest, Genting New York, LLC made a bid on the Aqueduct Project to the exclusion of Empire. As a result, Genting New York, LLC won the bid to develop the Aqueduct Project without Empire's participation.

### C. <u>The Rights Offering</u>

35. On or about December 29, 2010, Empire announced that it intended to engage in a subsequent effort to raise capital ("Rights Offering"), the sums of which were to be used to pay "outstanding indebtedness" allegedly owed to Kien Huat pursuant to a Loan Agreement, dated November 17, 2010, ("Kien Huat Loan"). <u>See</u> Exh. B at 6.

36. Upon information and belief, as a result of Kien Huat's domination of and control over Empire's Board of Directors, during a meeting in New York, Empire approved and issued the Rights Offering.

37. Moreover, upon the direction of Kien Huat and with the complicity of Defendants Au, D'Amato and Pearlman, Empire's Board of Directors refused to apply any of the proceeds of the Rights Offering to redemption of the Series E Preferred Stock, as required by the Recapitalization Agreement. Instead, Empire used all the funds to retire the Kien Huat Loan, which had no position of priority over the Recapitalization Agreement.

38. In certain public disclosures discussing the Rights Offering, Empire revealed that it had no intention of ever issuing a cash dividend, stating without qualification: "[w]e intend to retain all future earnings for use in the development of our business." See id. at 44.

39. Empire further disclosed in an S-1 Filing that it was extending subscription rights to all common stockholders (but excluding Plaintiffs as Series E Preferred Shareholders) to purchase approximately 0.56975 shares of common stock per share owned for $0.8837 per share.

40. However, Empire expressly reserved for Kien Huat a basic subscription right of 19,905,077 of the 39,606,201 shares Empire proposed to offer. See Exh. B at 3, 10. A later filing submitted by Empire to the SEC indicated that Kien Huat's basic subscription right was 19,826,382 shares. See Empire Resorts, Inc.'s May 20, 2011 SEC 13D/A ("13D Filing") at 4, a true and correct copy of which is annexed as Exhibit C.

41. Upon information and belief, Kien Huat directed Empire's Board of Directors' actions in this regard, which were taken with the specific and oppressive intent to obtain valuable assets from Empire in favor of Kien Huat and to Plaintiff's and Empire's detriment.

42. Upon information and belief, on or about December 29, 2010, Empire's stock closed at $3.03. See Empire Resorts, Inc. Historical Price Lookup for December 29, 2010, a true and correct copy of which is annexed as Exhibit D.

43. Empire's S-1 filing further disclosed that, as of the Rights Offering, its common stock was only owned in small-part by its current officers and directors, including Defendants Au, D'Amato, and Pearlman, but overwhelmingly by Kien Huat. Id. at 47-48. Also outstanding was Empire Series B Preferred Stock, which was entirely owned by a third party. The only other outstanding series of stock issued by Empire was Series E Preferred Stock, the majority of which is owned by Plaintiff.

44. Upon information and belief, at Kien Huat's direction, Empire did not extend subscription rights to Plaintiff in the Rights Offering.

45. Empire further disclosed that "Kien Huat has agreed pursuant to a letter agreement, dated November 5, 2010, to exercise its entire allocation of basic subscription rights. Kien Huat may also, but has not agreed to and is not obligated to, exercise its oversubscription rights in the rights offering." See Exh. B at 2.

46. The Rights Offering also disclosed that Empire's "ability to continue as a going concern [was] dependent upon the consummation of the [Rights Offering]." Furthermore, in the event the Rights Offering was not completed by June 30, 2011, Empire disclosed that although the maturity date of the Kien Huat Loan would be

extended to September 20, 2011, interest would accrue at a rate of 10% per annum, and there would be "no assurance that we will have funds available or be able to obtain a source of financing on terms acceptable to us, if at all, to satisfy any remaining unpaid principal outstanding under the [Kien Huat Loan] when due." Exh. B at 14.

47. Upon information and belief, Kien Huat, through its domination and control, caused Empire's Board of Directors to approve the Rights Offering rather than suffer a feigned default under the Kien Huat Loan. As disclosed in Empire's SEC filings, such a default could jeopardize Empire's ability to continue as a "going concern." Id.

48. The Rights Offering also disclosed that "[t]he exercise by Kien Huat of its basic subscription rights and oversubscription rights, to the extent exercised, will result in Kien Huat being able to continue to exercise substantial control over matters requiring stockholder approval upon completion of the offering." Exh. B at 10.

49. The Rights Offering, which was extended in April 2011, was completed as of May 18, 2011. Upon information and belief, consistent with Kien Huat's apparent plan to obtain control of Empire and its racing and gaming licenses, Kien Huat exercised the right to purchase in full, at a discounted price of $.08837 per share, 19,826,382 shares of Empire common stock. See Exhibit C at 4.

50. Empire's Schedule 13D, filed with the SEC, stated that "[a]s payment for the exercise of its rights, Kien Huat authorized the set off of $17,520,574 from the unpaid principal and accrued interest outstanding on the [Kien Huat Loan] previously disclosed in the Schedule D." See Exh. C at 4.

51. As a result of Kien Huat's exercise of subscription rights, its ownership interest in Empire increased from approximately 50.3% to 61.2% without further cash payment to Empire for that stock.

52. On the day that Kien Huat exercised its subscription rights, May 18, 2011, Empire's stock was trading at $1.66, almost double the amount Kien Huat paid pursuant to the Rights Offering. See Empire Resorts, Inc. Historical Price Lookup for May 18, 2011, a true and correct copy of which is annexed as Exhibit E.

53. Despite a threatened delisting by NASDAQ for failure to maintain the minimum bid price of $1.00, upon information and belief on or about August 11, 2011, at Kien Huat's direction and as part of a *quid pro quo* of continued cooperation by Empire's senior executives, the Compensation Committee of Empire's Board of Directors recommended and the Board of Directors approved a "cash bonus plan for [its] senior executives" ("Cash Bonus Plan"). Pursuant to the Cash Bonus Plan, $300,000 USD was annually set aside for Empire's officers, including Mr. D'Amato who also serves on Empire's Board of Directors.

54. Then, shortly thereafter, as a result of Kien Huat's domination and control over Empire's Board of Directors and as further *quid pro quo* from Kien Huat, Empire agreed to amend Mr. D'Amato's "Amended and Restated Employment Agreement" providing him with certain additional benefits, including a housing allowance of $1,500 USD per month, an automobile allowance of up to $1,500 USD per month, and a life insurance policy valued at $3,000,000 USD.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty
### (As Against Defendants Au, D'Amato, And Pearlman)

55. Plaintiff repeats and realleges Paragraphs 1 through 54 as if fully set forth herein.

56. As Directors of Empire, Defendants Colin Au, Joseph D'Amato, and Emanuel Pearlman owed and owe a fiduciary duty to the shareholders of Empire, including Plaintiff, to act in its and their interests.

57. Defendants Au, D'Amato, and Pearlman each breached their fiduciary duties to Plaintiff by, along with the remainder of Empire's Board of Directors, approving the Rights Offering and issuing excessive shares of Empire common stock to Kien Huat at a severe discount.

58. Plaintiff was one of four shareholders of Empire not accorded the right to purchase additional shares of Empire stock at the discounted price.

59. As a result of Kien Huat's purchase of 19,826,382 shares of Empire stock at the severely discounted price, Kien Huat's percentage of ownership of Empire increased from 50.3% to 61.2%, while Plaintiff's share of ownership and voting rights decreased proportionately.

60. As a direct and proximate result of breaches of fiduciary duty by Defendants Au, D'Amato, and Pearlman, Plaintiff has suffered monetary damages, greater than the jurisdictional amount of $75,000 but in an amount to be determined at trial, plus pre- and post-Judgment interest thereon, for which the Empire Directors are jointly and severally liable.

61. The misconduct of Defendants Au, D'Amato, and Pearlman was intentional, willful, wanton, malicious, and of such egregious nature that punitive damages are appropriate in addition to any compensatory damages for harm done to Plaintiff.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty
### (As Against Defendant Kien Huat)

62. Plaintiff repeats and realleges Paragraphs 1 through 54 as if fully set forth herein.

63. Kien Huat, as majority shareholder of Empire, exercised control over Empire by virtue of its (i) majority ownership interest of Empire's common stock and (ii) right to appoint three (3) of Empire's six (6) Directors.

64. As a result of its control over Empire, Kien Huat is a fiduciary to Empire's minority shareholders, including Plaintiff, and therefore owed it and them a fiduciary duty.

65. Kien Huat breached its fiduciary duty to Plaintiff through its domination of and financial control over Empire, including by (i) usurping Empire's corporate opportunities by, inter alia, providing the Confidential Aqueduct Materials to its affiliate, Genting New York LLC, and directing it to make a successful bid on the Aqueduct Project without Empire's participation, and (ii) directing the Board of Directors to implement the Rights Offering in Kien Huat's favor.

66. Pursuant to the Rights Offering, Kien Huat was given and exercised a right to purchase additional Empire common stock at a severely discounted price. Upon information and belief and at Kien Huat's direction, the Rights Offering did not grant a similar right to Plaintiff.

67. Upon its exercise of that right, Kien Huat purchased an additional 19,826,382 shares at the rate of $0.8837 per share of Empire common stock in exchange for forgiving the Kien Huat Loan. That purchase price was severe discounted as compared to the price at which what Empire's stock publicly traded that day.

68. As a result of its exercise of its rights under the Rights Offering, Kien Huat increased its percentage of Empire ownership from 50.3% to 61.2%, while Plaintiff's share of ownership and voting rights decreased proportionately.

69. As a direct and proximate result of the Kien Huat's breach of fiduciary duty, Plaintiff has suffered monetary damages, greater than the jurisdictional amount of $75,000 but in an amount to be determined at trial, plus pre- and post-Judgment interest thereon.

70. Kien Huat's misconduct was intentional, willful, wanton, malicious, and of such egregious nature that punitive damages are appropriate in addition to any compensatory damages for harm done to Plaintiff.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty on a Theory of Lender Liability
### (As Against Defendant Kien Huat)

71. Plaintiff repeats and realleges Paragraphs 1 through 54 as if fully set forth herein.

72. In addition to being the majority shareholder of Empire, Kien Huat was at all relevant times a lender to Empire.

73. As Empire's largest creditor, in addition to its majority ownership in Empire and its position as Empire's primary source of capital, Kien Huat exerted domination of and control over Empire's Board of Directors, such that Empire had no will of its own

but rather was forced to acquiesce to interests of Kien Huat. In light of their relationship, Kien Huat was and is a fiduciary to Empire's other shareholders, including Plaintiff.

74. Upon information and belief, Kien Huat, through its domination of and control of Empire, caused Empire's Board of Directors to approve the Rights Offering rather than face a "default" under the Kien Huat Loan and thus jeopardize Empire's ability to continue as a "going concern."

75. Kien Huat received an unfair benefit, because through the Rights Offering it received additional equity control over Empire as a result of purchasing additional Empire stock at a price severely discounted from that offered to the public, while simultaneously diluting Plaintiff's percentage of ownership and voting rights.

76. As a direct and proximate result of the Kien Huat's breach of fiduciary duty, Plaintiff has suffered monetary damages, greater than the jurisdictional amount of $75,000 but in an amount to be determined at trial, plus pre- and post-Judgment interest thereon.

77. Kien Huat's misconduct was intentional, willful, wanton, malicious, and of such egregious nature that punitive damages are appropriate in addition to any compensatory damages for harm done to Plaintiff.

**FOURTH CAUSE OF ACTION**

**Tortious Interference With Contract**
**(As Against Defendant Kien Huat)**

78. Plaintiff repeats and realleges Paragraphs 1 through 54 as if fully set forth herein.

79. On or about December 10, 2002, Plaintiff entered into the Recapitalization Agreement with Empire, which granted Empire the right to purchase Series E Preferred

Stock at $10.00 per share, plus accrued dividends at a rate of 8% of the liquidation value running from on or about December 10, 2002 through the date of redemption. Pursuant to the Recapitalization Agreement, as long as Series E Preferred Stock remained outstanding, Empire was and is not permitted to pay any dividends or distributions from the "Net Available Cash Flow" for any purpose other than for the purchase of Common Option Shares (which have been redeemed) or the Series E Preferred Stock, with the exception of $1,000,000 per year towards Empire's operating expenses.

80. Kien Huat had actual knowledge of the Recapitalization Agreement.

81. Kien Huat interfered with the Recapitalization Agreement by forcing Empire's Board of Directors to approve the Rights Offering to benefit Kien Huat in direct violation of the terms of the Recapitalization Agreement, namely, Section 1.9.

82. As a direct and proximate result of Kien Huat's domination of and control over Empire and its Board of Directors by, inter alia, causing it to allow Kien Huat to purchase additional shares of Empire common stock at a discount in exchange for forgiving the outstanding Kien Huat Loan, Empire breached the Recapitalization Agreement.

83. Without any rational business purpose but as part of its overall scheme to take control of Empire's racing and gaming licenses, Kien Huat utilized dishonest, unfair, and improper means to interfere with Plaintiff's contractual relationship with Empire by, inter alia, causing Empire's Board of Directors to approve the Rights Offering providing Kien Huat with significant majority control over Empire.

84. As a direct and proximate result of the interference by Kien Huat, Plaintiff has suffered monetary damages, greater than the jurisdictional amount of $75,000 but in an amount to be determined at trial, plus pre- and post-Judgment interest thereon.

85. Kien Huat's misconduct was intentional, willful, wanton, malicious, and of such egregious nature that punitive damages are appropriate in addition to any compensatory damages for harm done to Plaintiff.

**FIFTH CAUSE OF ACTION**

**Declaratory Judgment (28 U.S.C. § 2201)**
**(As Against All Defendants)**

86. Plaintiff repeats and realleges Paragraphs 1 through 54 as if fully set forth herein.

87. Section 1.9 of the Recapitalization Agreement provides that as long as Series E Preferred Stock remains outstanding, Empire is not permitted to pay any dividends or distributions from the "Net Available Cash Flow" for any purpose other than for the purchase of Common Option Shares (which have been redeemed) or the Series E Preferred Shares.

88. The foregoing gives the holder of Series E Preferred Shares, namely Plaintiff, priority to the payment of dividends, redemption and/or satisfaction of shares over the holders of Empire common stock including, but not limited to, Defendants.

89. Pursuant to Paragraph 3 of the Certificate of Designations, a copy of which is annexed as Exhibit A to the Recapitalization Agreement, Plaintiff has priority over all shareholders, including Defendants, to the payment of dividends, redemption and/or satisfaction of shares in the event of a voluntary or involuntary dissolution of Empire.

90. Empire agreed to robust restrictions on the use of its cash flow to ensure that the Series E shareholders would be paid as required, including barring the use of such cash to pay down any outstanding debts owed to Defendant Kien Huat before first retiring the Series E Preferred Shares.

91. In violation of the Recapitalization Agreement, Certificate of Designations, and in a bad faith effort to subordinate Plaintiffs' rights to priority payment of Net Available Cash Flow, Empire issued common shares generating Net Available Cash Flow and improperly used those proceeds to retire Defendant Kien Huat's debt and create a new class of debt in favor Kien Huat purporting to have priority over the Series E Preferred Shares.

92. An actual controversy exists as to whether Plaintiff is entitled to priority as to the payment of dividends, redemption, and/or satisfaction of shares over the holders of Empire common stock, including but not limited to Defendants.

93. Plaintiff has no adequate remedy at law.

94. Plaintiff requests entry of a Judgment declaring that Plaintiff Bryanston Group, Inc., as Series E Preferred Share holder, has priority over Defendants to the payment of dividends, redemption, and/or satisfaction of shares (i) from Empire's "Net Available Cash Flow" for any purpose, including that intended to retire any debt owed to Kien Huat, and (ii) in the event of a voluntary or involuntary dissolution of Empire.

**FIRST ALTERNATIVE REQUEST FOR RELIEF/**
**SIXTH CAUSE OF ACTION**

**Aiding And Abetting Breach of Fiduciary Duty**
**(An Individual Claim By Plaintiff Bryanston**
**Against Defendant Kien Huat)**

95. Plaintiff repeats and realleges Paragraphs 1 through 54 as if fully set forth herein.

96. Kien Huat aided and abetted Empire's Directors, including Defendants Colin Au, Joseph D'Amato, and Emanuel Pearlman, to breach their fiduciary duty to Plaintiff.

97. Empire's Directors, individually and collectively as a Board, owed a fiduciary duty to Empire's shareholders, including Plaintiff. Empire's Board of Directors breached its fiduciary duty to Plaintiff.

98. Kien Huat had actual knowledge of Empire's Board of Directors' fiduciary duty to Plaintiff, and that Empire's Board of Directors breached said fiduciary duties.

99. Empire's Board of Directors, including Defendants Au, D'Amato, and Pearlman, was and is under the direct control of Kien Huat. In connection with its domination of and control over the Board of Directors, Kien Huat provided substantial assistance to Empire's individual Directors to breach their fiduciary duties to Plaintiff by forcing them to approve the Rights Offering. But for Kien Huat's domination of and control, Empire's Board of Directors would not have issued the Rights Offering at the terms offered to Kien Huat.

100. As a direct and proximate result of the Kien Huat's substantial assistance to Empire's Board of Directors and said Board's breach of fiduciary duty, Plaintiff has suffered monetary damages, greater than the jurisdictional amount of $75,000 but in an amount to be determined at trial, plus pre- and post-Judgment interest thereon.

101. Kien Huat's misconduct was intentional, willful, wanton, malicious, and of such egregious nature that punitive damages are appropriate in addition to any compensatory damages for harm done to Plaintiff.

**RELIEF REQUESTED**

**WHEREFORE,** Bryanston Group, Inc. demands Judgment against Kien Huat Realty III, Ltd., Colin Au, Joseph D'Amato, and Emanuel Pearlman, as follows:

**A.** As to the First Cause of Action, award Plaintiff compensatory and punitive damages, legal costs, expenses, and attorneys' fees against Defendants Colin Au, Joseph D'Amato, and Emanuel Pearlman, jointly and severally, including pre- and post-Judgment interest thereon, in an amount to be determined at trial;

**B.** As to the Second through Fourth Causes of Action and First Alternative Request for Relief/Sixth Cause of Action, award Plaintiff compensatory and punitive damages, legal costs, expenses, and attorneys' fees against Defendant Kien Huat Realty III, Ltd, including pre- and post-Judgment interest thereon, in an amount to be determined at trial;

**C.** As to the Fifth Cause of Action, a judgment declaring Plaintiff Bryanston Group, Inc., as Series E Preferred Share holder, has priority over Defendants to the payment of dividends, redemption and/or satisfaction of shares (i) from Empire's "Net Available Cash Flow" for any purpose, including that intended to retire any debt owed to Kien Huat, and (ii) in the event of a voluntary or involuntary dissolution of Empire.

**D.** As to all Causes of Action, grant such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury in this action on all issues so triable.

Dated: New York, New York
December 26, 2012

Respectfully submitted,

MISHCON DE REYA NEW YORK LLP

By: ______________________
James J. McGuire
Vincent Filardo, Jr.

750 7th Avenue, Floor 26
New York, New York 10019
Telephone: (212) 612-3270
Facsimile: (212) 612-3297
James.McGuire@mishcon.com
Vincent.Filardo@mishcon.com

*Attorneys for Plaintiff Bryanston Group, Inc*

OF COUNSEL:

Andrew L. Asher
ANDREW L. ASHER, P.L.
4767 New Broad Street
Orlando, FL 32814
(407) 514-2697 (phone)
(407) 514-2698 (fax)

Edward B. MacMahon, Jr.
LAW OFFICE OF EDWARD B. MACMAHON, JR.
1307 New Hampshire Ave., NW, Suite 200
Washington, D.C. 20036
(202) 775-1307 (phone)
(202) 775-1308 (fax)