Preferences and Other Rights and Qualifications of the Series E Preferred Stock." Since then, Plaintiff has never received any notice to vote on any extraordinary corporate acts.

18. Pursuant to Section 1.9 of the Recapitalization Agreement, as long as Series E Preferred Stock remains outstanding, Empire is not permitted to pay any dividends or distributions from the "Net Available Cash Flow" for any purpose other than for purchase of Common Option Shares (which have been redeemed) or the Series E Preferred Shares. In addition, Empire agreed to robust restrictions on the use of its cash flow to ensure that Series E shareholders would be paid as required; to wit, as follows:

> [Empire] agrees that so long as any of the Preferred Shares remain outstanding, no dividends shall be paid and no distributions shall be made from the Net Available Cash Flow of [Empire] for any purpose other than purchase of the Common Option Shares or the retirement of the Preferred Shares. For purposes of this Agreement "Net Available Cash Flow" shall mean the net amounts received by [Empire] in connection with any sale of [Empire's] business assets after the date hereof, or the issuance of any stock or debt by [Empire], or the net amount resulting from any business operation(s) conducted by [Empire], but shall not include (i) any amount used to retire the outstanding promissory note issued by [Empire] to Societe Generale or (ii) such additional amount, not to exceed $1,000,000 in any calendar year, that [Empire] shall apply or set aside to apply for payment of reasonable operating expenses of [Empire].

Recapitalization Agreement at § 1.9. Upon information and belief, on or about June 20, 2003, Empire retired the Societe Generale loan.

19. Upon information and belief, since 2002, Empire has on various occasions either received proceeds from the (a) sale of Empire assets and/or (b) issuance of stock or debt and has distributed more than $1,000,000 in reasonable operating expenses <u>per</u> calendar year above such proceeds without redeeming any of the Series E Preferred Stock or making any payment of accrued dividends on such stock.

20. Upon information and belief, Empire has never calculated its "Net Available Cash Flow" for any given year despite a clear and unambiguous obligation to do so.

21. Kien Huat had actual knowledge of the Recapitalization Agreement.

**B. Kien Huat Gains Control Over Empire And Its Board Of Directors And Usurps Empire's Corporate Opportunity.**

22. On or about July 13, 2009, Lim Kok Thay ("Mr. Lim"), a beneficial owner of Kien Huat and its principal decision-maker, met with several Empire Directors to negotiate an agreement on investment between Kien Huat and Empire. Upon information and belief, this meeting took place in New York.

23. Upon information and belief, on or about August 19, 2009, Kien Huat entered into an Investment Agreement with Empire to purchase approximately 35,000,000 common shares in Empire in exchange for a $10,000,000 credit facility and approximately $55,000,000 in cash, which was to be paid in two tranches and concluded in November 2009 ("Investment Agreement"). Upon information and belief, the Investment Agreement was entered into in New York. As of on or about December 27, 2010, Kien Huat owned 34,936,357 shares of Empire common stock, representing approximately 50.3% of Empire's outstanding common stock, making it Empire's single largest shareholder.

24. As the majority shareholder in Empire, Kien Huat acquired the right to appoint three (3) of Empire's six (6) directors, which it has exercised. See Empire Resorts S-1, filed on December 29, 2010 ("S-1 Filing") at 25.

25. At the same time, Kien Huat and Empire entered into the Investment Agreement, pursuant to which Kien Huat appointed Messrs. Au and Michael G. Brown to Empire's Board of Directors. Together with Emanuel Pearlman, who Kien Huat had previously appointed to Empire's Board, Kien Huat has control of at least three of the six Directors on the Board. Mr.

Brown resigned in September 2010 owing to alleged health reasons; Kien Huat then elevated Mr. Pearlman to Chairman of the Board. In or about December 2010, Kien Huat appointed Mr. D'Amato, whom Kien Huat had previously made President and CEO of Empire. To date, all three of these individuals continue to serve on Empire's Board of Directors.

26. Upon information and belief, Empire's Board regularly meets and transacts business in the State of New York, including approving and directing the unlawful acts in violation and breach of the Recapitalization Agreement, as described herein.

27. Kien Huat is far more than a passive investor in Empire. Indeed, in addition to being Empire's largest shareholder, Kien Huat is Empire's largest creditor, primary source of capital, and an applicant and affiant on Empire's New York State racing and gaming licenses. As a result, Kien Huat holds overwhelming control over and domination of Empire's Board of Directors.

28. As provided in the Investment Agreement, on or about August 19, 2009, Empire entered into a Consulting Agreement with Mr. Au. Upon information and belief, the Consulting Agreement was entered into in New York. Under this Agreement, Mr. Au agreed to assist Empire in expanding its New York presence in the gaming industry and advise Empire on matters relating to casino development. In exchange for these services, Empire agreed to pay Mr. Au $300,000 USD annually in equal monthly installments, separate and apart from the compensation he was to receive as a Director of Empire.

29. Upon information and belief, during the July 19 meeting, Empire's former CEO, Joseph Bernstein, and two Empire directors, Ralph Bernstein and Louis Cappelli, proposed to Mr. Lim that Empire should bid on Aqueduct Racetrack's complex rehab center ("Aqueduct Project"), together with Kien Huat and certain additional partners, in a joint venture.

30. In or about early May 2010, before the request for proposal came out, Mr. Capelli discussed with Mr. Au the possibility of Empire and Kien Huat together bidding on the Aqueduct Project. Upon information and belief, these discussions took place in New York. During these discussions, Mr. Capelli provided Mr. Au with certain confidential materials generated by Empire, including a corporate strategy, projections, and a proposed minimum bid of $350,000,000 ("Confidential Aqueduct Materials").

31. Upon information and belief, Mr. Au shared the Confidential Aqueduct Materials with Empire Director Mr. Brown. Upon information and belief, neither Mr. Au nor Mr. Brown ever shared the Confidential Aqueduct Materials with Empire's remaining Directors.

32. Instead, upon information and belief, Messrs. Brown and Au disclosed the Confidential Aqueduct Materials to Mr. Lim, Kien Huat, and Genting New York LLC, a Kien Huat affiliate.

33. Subsequently, upon information and belief, at Kien Huat's behest, Genting New York, LLC made a bid on the Aqueduct Project to the exclusion of Empire. As a result, Genting New York, LLC won the bid to develop the Aqueduct Project without Empire's participation.

## C. The Rights Offering

34. On or about December 29, 2010, Empire announced that it intended to engage in a subsequent effort to raise capital ("Rights Offering"), the sums of which were to be used to pay "outstanding indebtedness" allegedly owed to Kien Huat pursuant to a Loan Agreement, dated November 17, 2010, ("Kien Huat Loan").

35. Upon information and belief, as a result of Kien Huat's domination of and control over Empire's Board of Directors, during a meeting in New York, Empire approved and issued the Rights Offering.

36. Moreover, upon the direction of Kien Huat and with the complicity of Defendants Au, D'Amato and Pearlman, Empire's Board of Directors refused to apply any of the proceeds of the Rights Offering to redemption of the Series E Preferred Stock, as required by the Recapitalization Agreement. Instead, Empire used all the funds to retire the Kien Huat Loan, which had no position of priority over the Recapitalization Agreement.

37. In certain public disclosures discussing the Rights Offering, Empire revealed that it had no intention of ever issuing a cash dividend, stating without qualification: "[w]e intend to retain all future earnings for use in the development of our business."

38. Empire further disclosed in an S-1 Filing that it was extending subscription rights to all common stockholders (but excluding Plaintiffs as Series E Preferred Shareholders) to purchase approximately 0.56975 shares of common stock per share owned for $0.8837 per share.

39. However, Empire expressly reserved for Kien Huat a basic subscription right of 19,905,077 of the 39,606,201 shares Empire proposed to offer. A later filing submitted by Empire to the SEC indicated that Kien Huat's basic subscription right was 19,826,382 shares.

40. Upon information and belief, Kien Huat directed Empire's Board of Directors' actions in this regard, which were taken with the specific and oppressive intent to obtain valuable assets from Empire in favor of Kien Huat and to Plaintiff's and Empire's detriment.

41. Empire's S-1 filing further disclosed that, as of the Rights Offering, its common stock was only owned in small-part by its current officers and directors, including defendants Au and D'Amato, but overwhelmingly by Kien Huat. Also outstanding was Empire Series B Preferred Stock, which was entirely owned by a third party. The only other outstanding series of stock issued by Empire was Series E Preferred Stock, the majority of which is owned by Plaintiff.